Law Offices Of
Donna R. Newman
Attorney at Law
20 Vesey Street, Suite 400
New York, New York 10007 tel. 212-
229-1516 fax 212-676-7497
donnanewmanlaw@aol.com
Admitted: N.Y. & N.J. Bar

April 15, 2020

By ECF and Electronic Mail
Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
United States Courthouse
300 Quarropas Street
White Plains, NY 10701

Re; *United States v. Antoine Cooper,* 12 cr 321(KMK)
    Emergency Motion for Compassionate Release Due to COVID-19 Pandemic

Dear Judge Karas:

In light of the extreme danger posed by COVID-19, Antoine Cooper, on behalf of Mr. Cooper, I respectfully move this Court for an order pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), the compassionate release provision of the First Step Act ("FSA"), reducing his sentence to a term of time served, to be followed by three years of supervised release.  We seek Mr. Cooper's immediate release to home detention and to prevent his release to a Residential Reentry Center ("RRC"). Mr. Copper release date is June 17, 2020, accordingly, the requested relief amounts to a reduction of two months.

Mr. Copper suffers from high blood pressure/hypertension which makes his particularly vulnerable to succumbing to the dreaded virus if he were to contract it.[1] He is designated to the Metropolitan Detention Center ("MDC") where conditions are nothing less than a petri dish for the explosion of contamination. Mr. Cooper informed counsel that he put in a request for Compassionate Release with his counselor at the MDC on April 7. On his behalf, on April 13, 2002, the undersigned emailed a formal request for Mr. Cooper's compassionate release to home detention to the warden of MDC, Warden Herman Quay which receipt was acknowledged by the MDC via email. No response to either of Mr. Cooper's request or my request.

The relief we seek from this Court does not amount to a significant reduction in Mr. Cooper's sentence-just 2 months- but is enormously significant for Mr. Copper's welfare. No one should be exposed to the conditions Mr. Cooper is enduring at the MDC and certainly not someone, who like Mr. Cooper, is by statute eligible for release to home detention. See 18 U.S.C. § 3624(c)(1)(2)(providing for the transfer of inmates to home confinement for the "shorter of 10 % of the term of imprisonment or 6 months."). This Court has the authority to reduce Mr. Coopers sentence under the FSA, granting him compassionate relief and under these circumstances and Mr. Cooper's individual circumstance, that is both prudent and well within Congress' intent in passing the statute.

**I. BACKGROUND**

On February 24, 2012, Mr. Cooper was charged by Complaint in a Southern District of New York with the distribution of heroin, the possession of a firearm in connection with that heroin distribution, and being a felon in possession of a firearm, in violation of Title 21, United States Code, Section 841(b)(1)(c) and Title 18, United States Code, Section 924(c) and 922(g).

---

[1] Lei Gang, George Karakiulakis, Michael Roth, *Are Patients with Hypertension and Diabetes Mellitus at Increased Risk for COVID-19 Infections?* The Lancet (Mar.11, 2020), at
https://www.thlancet.com/pdfs/jurnals/laures/PHS2213-2600(20)30116-8.pdf

Mr. Cooper plead guilty to these charges on February 13, 2013, Docket Entry # 7.  On December 5, 2013, Mr. Cooper appeared before this Court for sentencing. Docket Entry # 25. The Court found that the offense level for Counts One and Three (heroin distribution and felon in possession) was 13, and that his Criminal History Category V resulting in a guideline range for these counts of 30 to 37 months. Docket Entry # 33, sentencing transcript. The Count sentenced Mr. Cooper to a combined sentence of 90 months; Count One to a term of 30 months, Count Three to a term of 30 months to be served concurrently and to a term of 60 months on Count Two to be served consecutively to Counts One and Three. Docket Entry # 25.

Mr. Cooper' successfully appealed his sentence. Docket Entry # 27. The Second Circuit agreed with Mr. Cooper that the Court had erred in its criminal history calculation and remanded to this Court for resentencing. *Id*. On March 24, 2016, Mr. Cooper appeared for resentencing. Docket Entry # 27. The Court recalculated Mr. Cooper's CHC as IV, resulting in a lowering of the guideline range to 24 to 30 months from the previously range of 30 to 37 months. Resentencing trial at 8, Docket Entry # 37. The Court then sentenced Mr. Cooper to a combined total sentence of 84 months; 24 months on Count One and 24 months on Count Three to be served concurrent to Count One and to a term of 60 months to be served consecutively to the sentence imposed on Counts One and Three. As before the Court ordered a term of 3 years of supervised release. Mr. Cooper has now completed this sentence but for two months. Docket Entry # 37.

Mr. Cooper has received no disciplinary "tickets" during his incarceration. He has spent his time in jail endeavoring to better himself. He has numerous certificates including certificates in business administration, money smart, parenting, spiritual development. He has earned his

3

CDL certificate which makes him readily employable. While in prison he worked at the warehouse, in the kitchen, and did outside maintenance of the facility.

## II. THE UNPRECEDENTED COVID-19 PANDEMIC
.

This Court is fully familiar with the unprecedented COVID-19 pandemic ranging throughout the world. On March 11, 2020, the World Health Organization officially classified the new strain of coronavirus which causes COVID-19 as a pandemic.[2] About 20% of COVID-19 patients require hospitalization, about 10 times more than the percentage of patients with the flu.[3] It estimated to kill at least 10 people per thousand infected, making it ten times more lethal than the seasonal flu. *Id*..[4] The virus spreads at an exponential rate[5]: Just seven days ago, as of April 8, 2020, COVID-19 had infected over 1.5 million people worldwide. Today that figure is now over 2 million and with the death toll likewise, steadily climbing.[6] On March 26, 2020, the United States became the global leader in COVID infections.[7] As Of April 16th, 2020 the Center for Disease Control reports in the United States alone there are a total of 605,390 cases of the virus and deaths: 24,582.[8] The Washington Post today reports today the figure of people infected with COVID-19 is 639,000 and COVID-19 related deaths is 30, 999.[9] The number of confirmed

---

[2] *WHO Directio-General's Opening Remarks at the Media Briefing on COVID-19,* March 11, 2020 World Health Organization (Mar. 11, 2020), httaps://bit.ly2W8dwpS
[3] Pien Huang, How The Novel Coronavirus And The Flu Are Alike ... And Different, *www.npr.org* (Mar. 20, 2020) at https://www.npr.org/sections/goatsandsoda/2020/03/20/815408287/how-the-novel-coronavirus-and-the-flu-are-alike-and-different.
[4] *See also* Nick Wilson et al., *Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, 26 EID JOURNAL (prepublication June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0320_article.

[5] *Id.*
[6] *Coronavirus COVID-19 Global Cases*, CENTER FOR SYSTEMS SCIENCE AND ENGINEERING (CSSE) AT JOHNS HOPKINS UNIVERSITY, https://coronavirus.jhu.edu/map.html (last visited April 8, 2020, and April 16, 2020) (updating regularly).
[7] Tom Porter, *The US is Well on the Way to Having a Coronavirus Outbreak Worse than China's or Even Italy's*, BUSINESS INSIDER (Mar. 26, 2020), https://www.businessinsider.com/figures-show-us-soon-coronavirus-worse-china-2020-3
[8] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html April 16, 2020
[9] https://www.washingtonpost.com/graphics/2020/national/coronavirus-us-cases-deaths/ April 16, 2020.

COVID-19 cases continues to rise exponentially, but reported numbers underrepresent the true scope of the crisis—"experts believe that the United States still isn't testing enough people to detect the outbreak's true spread."[10]

There is no cure or vaccine for COVID-19. The most effective protective measure is social distancing of at least 6 feet apart, no direct contact with anyone who is suspected of having the virus, and washing hands and sanitizing surfaces that others have come into contact[11].

There is no dispute that conditions of imprisonment create the ideal environment for the transmission of contagious diseases.[12] The CDC recognizes the difficulty of preventing the introduction of COVID-19 into prison facilities:

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

*Id.;* see also Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is a Contraband?*, ABA JOURNAL (Mar. 13, 2020).[13]

---

[10] Alexis C. Madrigal & Robinson Meyer, *How the Coronavirus Became an American Catastrophe*, THE ATLANTIC (Mar. 21, 2020), https://www.theatlantic.com/health/archive/2020/03/how-many-americans-are-sick-lost-february/608521/

[11] *How to Protect Yourself*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html.

[12] Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 CLINICAL INFECTIOUS DISEASES 1047, 1047 (2007), https://doi.org/10.1086/521910. "Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced." Centers for Disease Control and Prevention (CDC), *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[13] https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

In short, the unavoidable close living conditions, movement of personnel in and out of the facility, the inability of the prisoners to protect themselves from contamination in the same manner as those outside the prison, means there are more people who are susceptible to getting infected and fighting the spread of an infection is nearly impossible and results in every single prisoner being vulnerable. see also, [14]

As of April 16, 20120, the BOP reported that there are 449 federal inmates and 280 BOP staff with open cases who have confirmed positive test results for COVID-19 nationwide.[15] These figures represent 100 new cases since April 13th reporting. With respect to MDC, the BOP official website reports that there were 4 inmates tested positive for the virus and 18 staff members.[16] These numbers are suspect if not deceptive because few inmates have actually been tested. [17] Anecdotal information from numerous inmates at the MDC reveal the total known infected inmates is likely 10 inmates.  Logically, the number is greater than reported since very little testing has been done at the MDC and the contagious nature of the virus, especially in jails, leads to the conclusion, there are many more inmates who are infected.

**III. MR. COOPER'S HIGH BLOOD PRESSURE AND CURRENT CONDITIONS AT MDC MAKE HIM VULNERABLE TO CONTRACT THE VIRUS AND OF NOT SURVIVING IS HE CONTRACT THE VIRUS.**

MDC has been on lock-down since mid-March as a measure to prevent COVID-19 from breaching the compound. There is no social distancing. The inmates do not have masks or gloves. There cells are not disinfected nor are the showers or other common areas. Mr. Cooper is currently locked into his cell 24/7 four days a week and allowed out 1 hour every three days to

---

[15] https://www.bop.gov/coronavirus/
[16] *Id.*
[17] https://www.law.com/newyorklawjournal/author/profile/Jane-Wester reporting on April 14,, 2002 that based on Metropolitan Correction Center and Metropolitan Detention Center's report to Chief Judge Roslynn Mauskopf no tests have been performed in the past five days.

6

make a phone call home.  Mr. Cooper reported as recently as yesterday, that he lacked soap, had no change of clothing, could not do laundry and lacked the basic supplies for even self-hygiene. He is currently housed in unit 41 where he understands the infected inmates are housed. He reports that 10 inmates are infected. Mr. Cooper has not seen anyone being tested. Mr. Cooper is naturally extremely anxious about the conditions of his incarceration, and fears he will contract the virus.

Mr. Cooper, who is only 31, suffers from high blood pressure since 2014.  His blood pressure has been as high as 140/120. He has not been prescribed medication but rather the BOP nurse has ordered for him a special diet to control his blood pressure. In light of his family history, it is highly likely that if he were to see a specialist, he would be prescribed medication.

His mother, father, and sister have high blood pressure and are on medication to control the disease. Mr. Cooper's father's father, his grandfather, Johnny Parramoar died from complications directly related to his high blood pressure. His grandmother, Joanne Cooper, and his father's siblings, his aunt and uncle, likewise suffer from high blood pressure and are prescribed medication to control it.

Since the lock-down Mr. Cooper has not received his special salt free meals. He was told if he doesn't strictly adhere to a salt-free diet he will suffer a heart attack. He reports having more frequent headaches and being light-headed, symptoms in the past that resulted in a high his blood pressure being high.  He is extremely anxious about contracting the disease in light of the living conditions. Although he has complained about his need for his blood pressure to be monitored it has not been tested.

**IV. UNDER THE FIRST STEP ACT, THIS COURT HAS BROAD AUTHORITY TO DETERMINE WHETHER EXTRAORDINARY AND COMPELLING CIRCUMSTANCES EXIST TO MODIFY MR. COOPER'S SENTENCE AND RELEASE HIM TO HOME CONFINEMENT.**

The FSA expressly permits Mr. Cooper to move this Court to seek compassionate release, by which this Court may reduce his term of imprisonment, and order that he serve the balance of the term-2 months- on home confinement as a special condition of an amended judgment.  See 18 U.S.C. § 3583(c)(1)(A)(i).  Under normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier.  Id.  As indicated, on April 13, 2020, undersigned counsel transmitted Mr. Cooper's request to the warden of MDC, the same request that Mr. Cooper had transmitted to his counselor on April 7th.  Although the BOP has yet to rule on the request (and thirty days have yet to pass), Mr. Cooper files this motion now in light of the urgent nature of this matter.

After exhausting the administrative process, "a court may then 'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Ebbers*, 2020 WL 91399, at *4, 02-CR-1144 (VEC) (ECF No. 384) (S.D.N.Y. Jan. 8, 2020).  "In making its decision, a court must also consider 'the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable.'"  *Id*. (quoting 18 U.S.C. § 3582(c)(1)(A)).

While courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." See, e.g., *Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020).  However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether

8

"extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's amendments. *United States v. Beck*, 2019 WL 2716505, at *5–6 (M.D.N.C. June 28, 2019); see also *Ebbers*, 2020 WL 91399, at *4. Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young,* 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) (collecting cases).

The unprecedented nature of this emergency compels the Court to find the exhaustion requirement waived. The Court need not and should not wait for Mr. Cooper to exhaust administrative remedies under § 3582(c)(1)(A), as this will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, while posing a particular and real danger to Mr. Cooper. See generally *Washington v. Barr*, 925 F.3d 109, 120–21 (2d Cir. 2019) ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile."). Federal courts have found that they can hear compassionate release applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is an emergency. E.g., *United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF Docket No. 84 (S.D.N.Y. Nov 12, 2019) (hearing and granting emergency compassionate release application of prisoner with cancer).

Specifically, courts across the country, and within this Circuit, have so held on the basis of the COVID-19 pandemic. See *United States v. Perez*, 17-CR-513 (AT) (S.D.N.Y.), ECF No. 98 (Apr. 1, 2020) (finding three exceptions to exhaustion applicable: (1) futility; (2) where the administrative process is incapable of providing the requested relief; (3) where the defendant is subjected to undue prejudice), see e.g. also *United States v. Phillip Smith*, No. 12 Cr. 133 (JFK), ECF Dkt. 197 (S.D.N.Y. Apr. 13, 2020) (finding court could waive exhaustion requirement and

granting compassionate release); *United States v. William Sawicz,* No. 08 Cr. 287 (ARR), ECF Dkt. 66 (E.D.N.Y. Apr. 10, 2020) (granting release over government objection, waived exhaustion); *United States v. Zukerman*, 16-CR-194 (AT) (S.D.N.Y.)ECF No. 116 (Apr. 3, 2020) (same); *United States v. Colvin*, No. 19-CR-179, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) (waiving exhaustion); *United States v. Powell*, 94 Cr. 316 (D.D.C.), ECF. No. 98 (Mar. 28, 2020) (same); *United States v. Huneeus*, 19-CR-10117 (D. Mass), ECF No. 642 (Mar. 17, 2020) (same).

These decisions waiving exhaustion accord with general administrative law principles and the exception to administrative exhaustion requirements in numerous statutory schemes. See, e.g., *Hendricks v. Zenon,* 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust administrative remedies where "exceptional circumstances of peculiar urgency are shown to exist") (citing *Granberry v. Greer*, 481 U.S. 129 (1987)); *Washington v. Barr,* 925 F.3d 109, 119 (2d Cir. 2019) (finding that administrative exhaustion requirements can be waived if delay would cause irreparable injury); *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010)(same).

"[A]pplication of the exhaustion doctrine is 'intensely practical'" and should "be guided by the policies underlying the exhaustion requirement." *Bowen v. City of New York*, 476 U.S. 467, 484 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 n.11 (1976)). Those policies were articulated by the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749 (1975): "Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review." 422 U.S. at 765. Conducting an

"intensely practical" analysis of these policies in the context of the Social Security Act's exhaustion requirement, the Supreme Court held in *Bowen* that courts "should be especially sensitive" to irreparable and severe medical harm resulting for blind adherence to a statutory exhaustion requirement, particularly "where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place." 476 U.S. at 484 (discussing 42 U.S.C. § 405(g)); see also *Rafeedie v. I.N.S.*, 880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J., concurring) ("As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition.").

When viewed in light of the unique crises, the unique exhaustion provision in § 3582(c)(1)(A) places this case squarely within *Bowen's* holding. Under § 3582(c)(1)(A), waiving exhaustion will "merely [ ] enable [Mr. Cooper] to receive the procedure [he] should have been afforded in the first place"—it will simply advance by what could be a crucial days this Court's consideration of Mr. Cooper's motion for compassionate release. *Bowen,* 476 U.S. at 484. To wit, § 3582(c)(1)(A) provides that motions for compassionate release are to be brought either by the "Director of the Bureau of Prisons, or upon motion of the defendant *after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf* . . . ." 18 U.S.C. § 3582(c)(1)(A) (emphasis added). In other words, § 3582(c)(1)(A)'s exhaustion requirement is not like other statutory exhaustion requirements, which expressly deprive federal courts of jurisdiction to hear disputes in the absence of exhaustion. Cf. *Booth v. Churner*, 532 U.S. 731, 736 (2001) (failure to exhaust

11

under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), means action cannot be maintained in federal court because that provision explicitly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (emphasis added)).  Rather, § 3582(c)(1)(A) merely controls who (the BOP or the Defendant) moves for compassionate release before the Court, and when (now, or long after COVID-19 has already swept even more widely throughout FCI Danbury than it already has).

     Congress' desire to avoid blind adherence to this "exhaustion" requirement is evidenced by the exception baked into § 3582(c)(1)(A), which provides that Defendants can bypass exhaustion altogether if the warden fails to act on an administrative application for compassionate release within 30 days.  § 3582(c)(1)(A) ("[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . ." (emphasis added)).  With this provision, Congress implicitly recognized that the policies underlying compassionate release are not furthered—and, indeed, actively frustrated—by excessive deference to bureaucratic process. Congress' concerns about delay are even more pronounced in the current public health crisis. As the Honorable   Rakoff, recently concluded in ruling on a Compassionate Release motion: Congress cannot have intended the 30-day waiting period of § 3582(c)(1)(A) to rigidly apply in the highly unusual situation in which the nation finds itself today. *United States v. Haney,* 19 cr

541(JSR)(SDNY April 13, 2020) ECF 27( Finding the 30 day notice waivable but finding defendant did meet criteria to grant Compassionate Relief).

While admittedly, even if the Court considers Mr. Cooper's notice to the Warden via deposing that request with his counselor on April 7 as the start of the 30-day period, there remains 21 days for the expiration of the 30-day period. In light of the extraordinary circumstances presented by unprecedented COVIS-19 crisis and the harm to Mr. Cooper during the duration this period, the policies underlying compassionate release, would be frustrated unless the Court waives this waiting period that serves, in this case, no real policy consideration.

## V. THE COURT SHOULD ORDER MR. COOPER'S IMMEDIATE RELEASE TO HOME DETENTION WHERE HE WILL BE SAFER AND THE PUBLIC WILL BE SAFE.

Importantly, Mr. Cooper fits squarely within those targeted by Congress and Attorney General Barr for release to home confinement, *as soon as possible*, in an effort to mitigate the risks to the jail population by COVID-19. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act states that "the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate.[18] Section 3642(c)(2) allows for a prisoner to "be transferred to home confinement for the shorter of 10 percent of the term of imprisonment or 6 months." The Attorney General has in his April 3 Memorandum, as envisioned by CARES Act, authorized the extension of the time period for release of inmates to home confinement.[19]

---

[18] Coronavirus Aid, Relief, and Economic Security (CARES) Act, H.R. 748, 116thCong. §12003(2).
[19] Mem. from Att'y Gen. William P. Barr to Dir. of Fed. Bureau of Prisons, *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr 3, 2020) (attached hereto and *available at* https://www.politico.com/f/?id=00000171-4255-d6b1- a3f1-c6d51b810000).) Mem. from Att'y Gen. William P. Barr to Dir. of Fed. Bureau of Prisons, *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr 3, 2020) *available at* https://www.politico.com/f/?id=00000171-4255-d6b1- a3f1-c6d51b810000).)

Mr. Cooper with only two months remaining on his 84 months term of incarceration qualifies under 3642(c)(2) for release to home confinement. As stated above, due to his high blood pressure, he is more susceptible to contacting COVID-19 and at a high risk of dying from the disease if he infected.[20] He is certainly an inmate targeted by CARES and Attorney General Barr for relief. He is already eligible for transfer into the community, and absent the delays presented by the pandemic, he would almost certainly already have a transfer to home detention.

He has a plan for release that places him in a safe place while at the same time protects the community. He will reside with his wife, Pilar Cooper, at her home and her two adult sons, in her 3-bedroom home at 327 Old Forge Hill Road, apt. 2193, New Windsor, New York. Although currently not working due to the COVID-19, she normally works as a school monitor, a position she has held for the last 24 years. She also works part-time at a warehouse. She along with her sons have remained quarantined for close to three weeks without symptoms of the virus. Neither she nor her sons have exhibited symptoms of the virus and have no reason to suspect they are infected. They all welcome Mr. Cooper's immediate return home.

We seek Mr. Cooper's immediate release to his home and not to a RRC or to wait 14 days for quarantine. See, *Sawicz,* 08 cr 287(ARR) (EDNY 4/10/2020)ECF # 66 (releasing defendant directly to home detention where he will self-quarantine).Rather than spend an additional 14 days quarantined at MDC where he will remain under the same conditions that he has been subjected to since the lock-down mid-March, he can self-quarantine at home. His home has a bedroom upstairs away from the remainder of the household-the other two bedrooms are downstairs. He has full medical insurance through his wife's medical coverage. This plan is safer for him and for the community. Once the stay-at home order is relaxed and Mr. Cooper can

---

[20]Coronavirus and High Blood Pressure: What's the Link? WebMed, https://www.webmd.com/lung/coronavirus-high-blood-pressure#1 Last accessed 4/16/2020

14

work, there are many opportunities for him to work, including working at warehouse and driving a truck once he obtains his CDL license- he already has his CDL certificate.

Under the conditions present here, resentencing of Mr. Cooper to time served and his immediate release to home detention is prudent under the extraordinary conditions that presently exist.

## VI. CONCLUSION

For the foregoing reasons, Mr. Cooper respectfully requests that the Court modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) to time served and order his immediate release to home confinement immediately or, in the alternative, hold a telephonic hearing as soon as possible. Should the Court wish to hold a hearing, counsel waives Mr. Coopers' appearance, upon his consent.

Thank you for your consideration of this motion.

Respectfully submitted,

/s/

Donna R. Newman
cc: AUSA Rebecca Mermelstein via Email & ECF
    AUSA Daniel Filor via Email & ECF